**James Joseph Connolly, Ph. D.**
**Licensed Psychologist**
758 Broad Street Extension, Waterford, CT   06385
Telephone: 860-442-6218
Fax: 860-447-2477

### SUMMARY  OF  FORENSIC  PSYCHOLOGICAL  EVALUATION

At the direction of a member of his legal defense team, Attorney Jeffrey B. Cohen of Hamden, Connecticut, Ted Hakey (48) consulted with me on 2/04/16, 3/02/16 and 3/23/16 for the purpose of conducting a forensic psychological evaluation related to the charge of Destruction of Religious Property.  Mr. Hakey faces this charge in the United States District Court for the District of Connecticut as a result of his firing four rifle shots into the Baitul Aman Mosque during the early morning hours of 11/14/15. The mosque and the home owned by Mr. Hakey are on adjoining lots in Meriden, Connecticut.  Mr. Hakey has specified his responsibility for the firing of the rifle shots into the mosque. The issue before the court is the punishment to which Mr. Hakey will be sentenced for the actions he has already acknowledged.  As a result of the fact that he has no convictions for violent offenses and no recent criminal convictions of any kind, Mr. Hakey faces a reduced level of federal punishment. Given his offense characteristics and his general lack of criminal history, Mr. Hakey's guideline imprisonment range is 8 to 14 months. A fine is also suggested by the guidelines as well as a supervised release term of one to three years.  During the process of sentencing, the prosecution has announced its intention to argue that there is sufficient evidence to conclude beyond a reasonable doubt that Mr. Hakey intentionally selected the Baitul Aman Mosque in Meriden as the object of his actions because of the religion of individuals who worship there. A presentence report on this case was prepared by United States Probation Officer Mark D. Myers on 3/24/16, and a copy of this report was conveyed to me by Attorney Cohen.

The purposes of my forensic psychological evaluation were to determine 1.) Mr. Hakey's overall psychological status, 2.) his state of mind at the time of the commission of the offense, and 3.) his rehabilitation potential and the conditions and circumstances under which his rehabilitation potential may be maximized.  These are, of course, relatively standard considerations in a forensic evaluation in a criminal case. I am a forensic psychologist who regularly evaluates individuals in Connecticut in civil and criminal matters. In pursuing this forensic psychological evaluation of Mr. Hakey, I interviewed him on three occasions for a total of more than twelve hours. I administered psychological testing to him during these interviews. The psychological tests that were used as part of the interview were standard instruments that are frequently used in similar evaluations. They were the Beck Depression Inventory (BDI), the Personality Assessment Inventory (PAI) and the Millon Clinical Multiphasic Inventory-Third Edition (MCMI-III). The psychological testing was employed as a way of confirming or disconfirming the

clinical impressions of the evaluator.  Mr. Hakey was a forthcoming interviewee, and a reasonable level of rapport was established between him and the evaluator. As a result of this rapport and the information available to me from the interviews, the results of the psychological testing, and the facts of the case as described in the federal presentence report, I was able to form a set of conclusions and recommendations about which I am certain to a reasonable level of professional certainty.

In terms of Mr. Hakey's overall psychological status, he presents an interesting combination of healthy and unhealthy psychological characteristics. There is little question about the fact that his overall life orientation is prosocial rather than antisocial. He has held stable employment of a more or less uninterrupted sort throughout his adult years.  He has had a stable relationship with his current spouse for a period of more than ten years, and the two of them have been married for the last five years.  Mr. Hakey has an honorable discharge from serving in the United States Marine Corps. Since being discharged from the Marines in early 1990, he has worked mainly in a business started by his father that involves maintaining automobile inventory data for large car dealerships in Connecticut.  This business was primarily an independent, family-owned operation until a couple of years ago when Mr. Hakey became an employee of the primary client of his family's company. Mr. Hakey was charged with possession of cannabis in late 1990 and this charge was disposed of by way of a $150 fine. Mr. Hakey also has pending charges in Meriden Superior Court related to cannabis possession. The most remarkable aspect of his overall level of social adjustment is that Mr. Hakey has generally had a socially stable life and has avoided incidents of violent behavior.

There are, however, two distinctly unhealthy elements in Mr. Hakey's overall psychological status. These characteristics do not in any way eliminate or diminish his overall prosocial lifestyle.  They do, however, stand in contrast to his generally prosocial orientation, and they have represented a progressively greater obstacle to his maintaining a stable lifestyle in recent years. The first of these unhealthy psychological characteristics is Mr. Hakey's alcoholism, and the second unhealthy psychological characteristic is his tendency toward sensation-seeking and his pursuit of a reputation as a "tough" or "bad ass" character.   Mr. Hakey's alcoholism is of a rather advanced nature. According to the information that I gathered during my interviews with Mr. Hakey, his alcoholism is episodic in nature. As an episodic alcoholic, he is characterized by periods of very high alcohol consumption with lengths of time when he has substantially lower alcohol consumption or no consumption at all between these episodes of high consumption. As an episodic or "binge" drinker, Mr. Hakey will sometimes consume well in excess of ten standard doses of alcohol at a single sitting. During recent years, Mr. Hakey has fallen into a pattern of heavy episodic use of alcohol on weekends. This has permitted him to fulfill his occupational obligations during the workweek. His level of alcohol consumption and the effect of this consumption on his functioning during his episodes of high consumption have gradually become more problematic in recent years. My interviews with Mr. Hakey, however, indicate that he was having episodes of extremely

problematic drinking as early as the late 1980s. As his episodic alcoholism has progressed, he has experienced increasing levels of mnemonic interference with respect to the episodes of extremely high consumption of alcohol. As a severe episodic alcoholic with a pattern of the mnemonic interference during episodes of high consumption, Mr. Hakey may be characterized as going on a kind of "autopilot" during his alcoholic binges in which he operates with an impaired and degraded form of consciousness and recollection as well as some level of interference with motor coordination. Mr. Hakey is typical of other people with advanced forms of episodic alcoholism in that the mnemonic interference is both intra-episodic and post-episodic. The intra-episodic mnemonic interference is related to the fact during the intense drinking episodes themselves, his normal ability to recall and process personal and other information is substantially below that which he would have during regular unimpaired consciousness. The post-episodic mnemonic interference relates to his having substantial difficulty recalling after an alcoholic binge the nature and order of events that took place during the drinking episodes.  I note that these episodes of general functional difficulty associated with mnemonic interference are sometimes referred to as "blackouts," but a substantial body of research indicates that the mnemonic effect of the alcohol is more likely disruptive and relative rather than a complete and absolute elimination of mnemonic traces.  Mr. Hakey's serious alcoholic condition appears to have some heritable component. He had a full biological sister who died in 2011 at the age of 48 due to the physical effects of chronic alcoholism.

The second unhealthy psychological characteristic which is clear in Mr. Hakey's psychological status is his pursuit of sensational events and a reputation as an "tough" or "bad ass" individual. Mr. Hakey's choice of the Marine Corps as his branch of service was associated with his desire for this particular type of reputation. Although he did not remain in the Marine Corps after his five-year enlistment, Mr. Hakey was unquestionably a very "gung ho" Marine, and he maintained substantial elements of this persona after his discharge. He became a competitive sniper shooter, and he remains proud of his accomplishments in that area. He continue to strongly identify with the Marine Corps and with a camaraderie among physically fit males who are able to defend themselves and others. He explained to me that he became involved in motorcycle gangs because of his desire to associate with men who are very psychologically independent-minded and able to defend themselves and others in a wide variety of circumstances.  His orientation toward motorcycle gangs was interesting in that he appears to have functioned as a voice of moderation in these groups who made efforts to help these groups to solve their differences of opinion short of intense interpersonal violence and the commission of violent crimes. There is no question, however, that he enjoyed the sense of danger that pervaded association in motorcycle groups and that he actively participated in the mystique of motorcycle groups as representing a kind of "outlaw" element in society. The contrast between his generally law-abiding behavior and his desire to flaunt "bad ass" characteristics in the forms of success in shooting competitions, heavy body tattooing, and involvement in motorcycle groups was very marked and clear to this evaluator.

Individuals who have anomalous behavioral patterns of this sort are typically characterized by both a high need for excitement and some level of fundamental difficulty in their sense of identification with their own fathers. Both of these characteristics appear to be operating in the case of Mr. Hakey.

Mr. Hakey's sensation seeking and his desire for a "bad ass" reputation were manifested in his self-identification as an ongoing defender of both the Marine Corps and the United States of America. He reacted strongly when there were terrorist attacks by Muslim militants, and his emotional reaction to the attack by Muslim militants on a US Marine core recruiting center in Chattanooga, Tennessee on 7/16/15 was powerful. Mr. Hakey's expressions of loathing for the perpetrators of these terrorist actions were pronounced and quite consistent with his sensation-seeking and his desire to appear to be someone with a "tough" personal reputation and social demeanor. This expression of bravado related to terrorist attacks even led him to express sentiments related to killing Muslims and destroying mosques. I would note, however, that denunciations of Muslim militants who undertake terrorist actions has a very high base rate among residents of the United States. In other words, there are millions of people in the United States who express strong reactions to terrorist attacks and many, many thousands who use sanguinary or even exterminist rhetoric in these situations.

Mr. Hakey's status as a sensation-seeker was very clear in the results of his psychological testing. The sensation-seeking tendency was the most obvious departure from the norms in his psychological test results. The psychological test results indicated that Mr. Hakey is not characterized by a diagnosable disorder of mood, anxiety, or thought processes. Mr. Hakey's tendency toward sensation seeking was, however, several standard deviations above the norm. There were no other deviations from the norm that came any place close to approaching this particular characteristic of Mr. Hakey. The psychological test results also clearly indicated the appropriateness for Mr. Hakey of a diagnosis of alcohol dependence. The results of the psychological testing that I performed on Mr. Hakey confirmed my clinical impressions that he was free of a diagnosable thought disorder, mood disorder or anxiety disorder. I note that the psychological testing indicated that despite his high level of sensation-seeking, Mr. Hakey does not have significant levels of more central components of antisocial personality tendencies. In this respect also, my clinical impressions were essentially confirmed by the results of the psychological testing that I administered to Mr. Hakey.

To summarize my findings concerning Mr. Hakey's general psychological characteristics, he is not characterized by a significant psychological disorder in the nature of a psychosis, a mood disorder or an anxiety disorder. In terms of his personality functioning, he is an extreme sensation-seeker and someone who as part of that sensation seeking, portrays himself with a large amount of bravado. He has sociopolitical sentiments and has maintained personal associations that have tended to express his sensation-seeking and his desire for a reputation as a possibly dangerous individual.

These characteristics, however, have existed side-by-side with his generally law-abiding behavior, and there is a lack of a sufficient body of antisocial behavior to suggest the appropriateness of a diagnosis of psychopathy or antisocial personality tendencies.  Mr. Hakey is an episodic alcoholic, but he was generally able to moderate the effect of his alcoholism on his work and social functioning.   During my interviews with Mr. Hakey, however, he acknowledged that the combined effects of his bravado and sensation-seeking with his episodic heavy drinking had gradually been taking a greater toll on him.  He had increasing difficulties dealing with the psychological disorientation and physical unease that he would feel in the aftermath of his drinking episodes. He gradually reached a point, however, where he became used to not having a fully organized recollection of the nature and order of events during his drinking episodes.  He also started to develop the very unfortunate habit of using firearms while being intoxicated with alcohol. For instance, he explained to me that about a week before the incident on the morning of 11/14/15, he had been visiting a relative of his in Maine.  During this visit, he engaged in heavy drinking and heavy use of firearms on a private firing range owned by his relative. Although Mr. Hakey understood that the use of firearms while he was intoxicated was a potentially quite dangerous habit, and he had always maintained sober states of mind during his involvement in competitive shooting, an association of heavy drinking and use of firearms had definitely begun to emerge during 2015.  There had been a number of incidents in which he had used firearms in his backyard, and some of these incidents had occurred when he had been drinking, although typically not during periods of a full alcoholic episode with mnemonic interference.

Turning now to Mr. Hakey's state of mind during the incident in the early morning of 11/14/15 when he fired four rifle shots into a mosque in Meriden, Connecticut, I note that it is my professional opinion that there is insufficient evidence that Mr. Hakey may be fairly characterized as having intentionally selected the mosque as the object of his shooting because of the religion of the individuals who worship there.  Indeed, there is a reasonable body of evidence and inference indicating that Mr. Hakey's firing of rifle shots at the mosque was not associated with a mental state of wishing to harm in some way the worshipers at the mosque because of their Muslim faith. I acknowledge that Mr. Hakey expressed an animus toward Muslims on a number of occasions in his Facebook postings. This animus toward Muslims was expressed in at least two dozen such postings over a period of the last two years. These postings make it clear that Mr. Hakey was from time to time angry at what he viewed as terrorist attacks inspired by militant Muslim ideology. On the night of 11/13/15, Mr. Hakey conversed through Facebook with an individual who made him aware of the fact that there had been another serious terrorist attack in Paris, France. Mr. Hakey's reaction to this information was to make the following statement on Facebook: "What is going to be the breaking point to go weapons free against Islam."  This posting on Facebook was made approximately six hours before he fired rifle shots at the mosque in Meriden.  The case against Mr. Hakey relies on his repeated statements on Facebook of animus toward Muslims as a supposed source of

terrorism and in particular this statement as a to a "breaking point" made approximately six hours before the firing on the mosque.

There is substantial doubt as to whether Mr. Hakey's state of mind at the time of his firing on the mosque consisted of intentional and selective violence toward a religious building because of the religious beliefs of the individuals who worshipped there.  I note that Mr. Hakey has consistently denied that he fired on the mosque in an intentional fashion. Although his state of mind in a Facebook posting to a friend six hours prior the mosque shooting certainly indicate some animus toward Muslims, it is more likely that at the time of his firing on the mosque, Mr. Hakey's state of mind was too disorganized by reason of his excessive drinking in a full-out alcoholic episode with mnemonic interference to meet the requirements of selective intentionality.

There is one important aspect to the issue of selection that must be noted here. In the typical incident in which an individual engages in selective violence against a religious or ethnic group, a target is determined which involves some special pattern of activity and motion to get into position with respect to the target. In the case of Mr. Hakey's firing at the Baitul Aman Mosque in Meriden, however, a fact of overriding importance is that Mr. Hakey and the mosque have been physical neighbors for some years. Mr. Hakey explained to me that he resided at his current residence prior to the location of the mosque as his neighbor. Mr. Hakey had coexisted as a neighbor of the mosque for a period of years.  His informal firing range in his backyard is less than 150 feet from the mosque. It is important to appreciate that the propinquity of Mr. Hakey's home and the mosque is not a matter of his selection but a mere geographical reality.  Mr. Hakey's recreational resort to firearms, his drinking habit, and his proximity to a public building such as a mosque represent a combination of circumstances that must be appreciated to be dangerous in a way that does not necessarily involve the immediate operation of a religious animus toward the individuals who regularly used that public building.  I also note that despite Mr. Hakey's expression of an animus toward Muslims on Facebook, there does not appear to be any indication that he joined groups dedicated to taking action against Muslims or was engaged in any reading or ideological projects that might be considered to represent a hardening and extension of his animus toward Muslims. His expression of this animus was apparently restricted to a kind of emotional venting that took place mainly within his Facebook pages and mainly in response to breaking news of terrorist attacks by militant Muslims.

I have discussed the events of late 11/13/15 and the early hours of 11/14/15 with Mr. Hakey in substantial detail. The principle conclusion to which I have come is that Mr. Hakey's recollection of details during his firing on the mosque (and for at least a few hours prior to that incident) is extremely jumbled and disorganized by reason of mnemonic interference due to his having consumed at least ten doses of alcohol that night. On the night under discussion, Mr. Hakey had a meeting at a bar with an old friend of his. The event was positive and emotionally reinforcing for Mr. Hakey, because it

represented a reconciliation of his differences with his old friend. Mr. Hakey acknowledged to this evaluator that he had no precise recollection of the number of drinks he consumed at the bar where he was reconciling with his old friend. His reckoning that it might have been ten drinks was purely an estimate, because he lost track of the number of drinks that he had consumed.  This is typical during his alcoholic episodes. He did recall that the drinks being served at the bar were very strong in nature, so that his actual consumption may well have been substantially in excess of ten standard doses of alcohol.

Mr. Hakey showed me a picture that had been taken on his cell phone from his time in the bar with his friend on the night of 11/13/15.  In this picture, Mr. Hakey, his friend, his friend's girlfriend and Mr. Hakey's wife are present and broadly smiling. In the photo, Mr. Hakey appears to be extremely intoxicated but in an affable state of mind. The photograph was apparently taken approximately two hours prior to Mr. Hakey firing rifle shots that hit the mosque.  Mr. Hakey explained to me that he has no clear recollection of leaving the bar and driving home, but he believes that he drove the car home rather than his wife driving it. He acknowledged that his reconstruction of the events of that night is quite imprecise due to the fact that after consuming five or six drinks, his memory disruption became quite substantial. I note that it is reasonable to believe that not only was there a post-episodic mnemonic disruption as a result of his heavy drinking in the late hours of 11/13/15, but that there was probably also an intra-episodic mnemonic disruption as well.  In other words, due to his having entered a dissociative and disorganized state of mind as a result of heavy consumption of alcohol, Mr. Hakey's internal psychological processes were likely of a highly jumbled and disoriented nature. He explained to me that he recalled that he still had a mainly positive and celebratory feeling state toward the end of his drinking at the bar with his reconciling friend, and that when he and his wife reached home, he suggested to his wife that he would go and fire off some rounds in the backyard as an extension of his celebratory feeling.  He appears to have also consumed some additional alcohol at home either before or while firing his rifle.

Not only were Mr. Hakey's mental processes highly disorganized and impaired when he fired off some twenty rifle shots in the early morning hours of 11/14/15, his physical coordination must also have been severely affected.  As a result, Mr. Hakey (who when sober had won prizes for his marksmanship) appears to have sprayed his shots over a wide area in a disorganized fashion, and four of the shots came to rest in the rear of the nearest building adjacent to his informal backyard shooting range, which was the Baitul Aman Mosque.   There is a substantial likelihood that at the time of this disorganized shooting in the aftermath of a celebratory event in Mr. Hakey's life, Mr. Hakey's sociopolitical sentiments regarding Muslims were not part of his consciousness in any organized fashion. The nature of the action when considered in its full situational context appears to be more a squalid incident of random alcoholic carelessness rather than the intentional and selective destruction of the place of worship of followers of Islam.

Turning now to Mr. Hakey's rehabilitation potential and the circumstances and conditions in which this potential might be maximized, it is my professional opinion that Mr. Hakey has excellent prospects for making a substantial personal rehabilitation and that imprisonment is unlikely to facilitate this personal rehabilitation. The treatment recommendations in the presentence report of 3/24/16 appear to be well-crafted and highly appropriate for Mr. Hakey. These involve substance abuse treatment, individual psychotherapy emphasizing anger management and cultural competency, and remaining free of firearms and other dangerous weapons. In my professional opinion, Mr. Hakey has reacted to the events of mid-November 2015 and his resulting criminal charges in a highly constructive and commendably mature fashion. I note that in my many years of practice as a forensic psychologist, most persons who are significantly alcoholic will tend to maintain some substantial denial of the severity of their alcoholism and some resistance to abstinence and treatment for their alcoholism regardless of the seriousness of the consequences in which they are currently immured.  Mr. Hakey is a very notable and pleasant exception to this general principle. He openly acknowledges that he is an alcoholic, and he is well along in coming to terms with both his current clinical treatment for alcoholism and the self-help program of Alcoholics Anonymous.  He brings to the personal rehabilitation process, both substantial good faith and with some reasonable level of unselfconscious commitment.  He is able to articulate the need for continuing abstinence from alcohol and other psychoactive substances on a long-term basis.  He is a generally psychologically-minded individual who is interested in beginning individual psychotherapy with an experienced practitioner. Given the fact that he is an intelligent and psychologically-minded individual who is responding to his current disastrous personal circumstances with a reasonable level of chastening and insight, the likelihood that he will be able to productively benefit from psychotherapy is reasonably large. I note that Mr. Hakey will likely be able to maintain his current employment if he is not incarcerated.  A sentence of incarceration, however, will likely result in the loss of his long-term employment which will be a substantial setback for him and his family and which will make his transition to a more stable and less dangerous lifestyle more difficult. I have explained to Mr. Hakey the possible beneficial role in the future of prescribed psychotropic medication to assist him in coping with the onset of physical cravings for alcohol and/or the expression of his sensations-seeking tendencies in attraction to additional dangerous maladaptive patterns of behavior.  He is open to such psychiatric services if they would be helpful for him in the future.

                                              James J. Connolly, Ph. D.
                                              Licensed Psychologist